# Illinois Official Reports

## Appellate Court

---

*City of Springfield v. Policemen's Benevolent & Protective Ass'n, Unit #5,*
2021 IL App (4th) 200164

---

| | |
|---|---|
| Appellate Court Caption | THE CITY OF SPRINGFIELD, Petitioner, v. THE POLICEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, UNIT #5; THE SPRINGFIELD FIREFIGHTERS, INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 37; and THE ILLINOIS LABOR RELATIONS BOARD, STATE PANEL, Respondents. |
| District & No. | Fourth District<br>No. 4-20-0164 |
| Filed | July 27, 2021 |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, State Panel, Nos. S-CA-19-046, S-CA-19-066. |
| Judgment | Affirmed. |
| Counsel on Appeal | James K. Zerkle, Steven C. Rahn, and John M. Zimmerman, of Springfield, for petitioner.<br><br>Ronald J. Stone, of Stone Law Office, of Springfield, for respondent Policemen's Benevolent and Protective Association, Unit No. 5. |

Matt Pierce and Margaret Angelucci, of Asher, Gittler & D'Alba, Ltd., of Chicago, for respondent Springfield Firefighters, International Association of Firefighters, Local 37.

Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Carson R. Griffis and Valerie Quinn, Assistant Attorneys General, of counsel), for other respondent.

Panel         JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Knecht and Justice Turner concurred in the judgment and opinion.

## OPINION

¶ 1      Petitioner, the City of Springfield (City), seeks administrative review of a decision of the Illinois Labor Relations Board, State Panel (Board). The Board found the City committed unfair labor practices and violated sections 10(a)(1) and 10(a)(4) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1), (4) (West 2016)) by (1) unilaterally adopting a rule amendment affecting City employees without giving respondents—the Policemen's Benevolent and Protective Association, Unit #5 (Policemen's Union) and the Springfield Firefighters, International Association of Firefighters, Local 37 (Firefighter's Union)—notice and an opportunity to bargain over the change and (2) altering the status quo during interest arbitration with the unions. *Policemen's Benevolent & Protective Ass'n, Unit #5*, 36 PERI ¶ 113 (ILRB State Panel 2020) (hereinafter *Policemen's Benevolent & Protective Ass'n*, 36 PERI ¶ 113). On review, the City argues the Board erred in finding it violated the Act because it neither (1) refused to bargain the application or impact of the amendment nor (2) altered the status quo. We affirm.

¶ 2                               I. BACKGROUND

¶ 3      The City is a public employer under the Act. It has 1400 employees, 237 of which are members of the Policemen's Union and 205 of which are members of the Firefighter's Union. The City also has a civil service commission, established by city ordinance, which sets forth "standards" for City employees. Commissioners of the City's Civil Service Commission are appointed by the City's mayor with the advice and consent of its city council.

¶ 4      On September 5, 2018, the Civil Service Commission adopted an amendment to one of its rules, Civil Service Commission Rule 4.3 (Rule 4.3), that allowed for an award of residency "preference points" to City employees on examinations for promotion. In November 2018, the Firefighter's Union filed an unfair labor practice charge against the City (case No. S-CA-19-046) based on that amendment. It alleged the City violated sections 10(a)(1), 10(a)(4), and 14(*l*) (5 ILCS 315/10(a)(1), (4); 14(*l*) (West 2016)) of the Act because it unilaterally changed the status quo during the parties' contract negotiations "by amending the rules for promotions" without notice or an opportunity for bargaining with the union. In December 2018, the

- 2 -

Policemen's Union also filed an unfair labor practice charge against the City (case No. S-CA-19-066), raising similar claims. Following investigations, the Board's executive director issued complaints for hearing in each case. The matters were consolidated for a hearing, which occurred in June 2019 before an administrative law judge (ALJ).

¶ 5    At the hearing, the parties presented a combined stipulation of facts for the ALJ's consideration that showed the following. The City and the Policemen's Union were parties to a collective bargaining agreement (CBA) that expired on February 28, 2018. In December 2017, shortly prior to the expiration of that CBA, the parties began negotiations for a successor CBA. In January 2018, the Policemen's Union invoked the "interest arbitration process" under section 14 of the Act (*id.* § 14). During the bargaining process, the City proposed a change to residency requirements for union members, in that newly hired members would be required to live within the City while current members "would be subject to a grandfather clause." The City "did not make any proposals relating to residency preference points for promotions." Conversely, the Policemen's Union "proposed that the status quo on residency requirements be maintained."

¶ 6    The parties' stipulated facts also showed the City and the Firefighter's Union were parties to a CBA that expired on February 29, 2016. On January 27, 2016, the Firefighter's Union also invoked "the interest arbitration process" under section 14 of the Act. *Id.* On February 28, 2019, the City and the Firefighter's Union signed a successor CBA, effective March 1, 2016, through February 28, 2021.

¶ 7    The parties agreed that, on September 5, 2018, the City's Civil Service Commission approved a change to one of its rules, Rule 4.3, entitled "Veteran's Preference in Examinations and Promotions and Residency Preference for Original Appointment/Entry-Level Positions and Promotions." The change added a new subsection that provided for an award of residency "preference points" to City employees on examinations for promotions in the event the employee had lived within the city for nine consecutive months prior to the examination. The added subsection stated as follows:

> "D. Qualified persons who have passed an examination for promotion shall be granted residency preference points if the following condition is met:
>
> 1. The legal residence of the candidate must be an address that is within the City of Springfield corporate limits and has been the candidate's legal residence for at least nine (9) consecutive months as determined by the chief Examiner in the application packet. Residency preference points shall be made effective and apply to any promotion eligibility list that is certified after the date this rule is passed by the Civil Service Commission. For any written examination taken prior to the certification of an eligibility list that is certified after the date this rule is passed, proof of residency shall be provided within the thirty (30) days after the passage of this rule, and proof of residency shall include but is not limited to a prior utility and/or telephone bill in the candidate's name, rental agreement in the candidate's name or property tax bill in the candidate's name. Thereafter, proof of residency must be provided prior to taking the written examination for promotion, which may include but is not limited to a prior utility and/or telephone bill in the candidate's name, rental agreement in the candidate's name or property tax bill in the candidate's name.
>
> 2. The Civil Service Commission shall add three points to the final examination grade of any candidate who has met the criteria outlined above."

¶ 8        The change to Rule 4.3 was adopted while contract negotiations were ongoing between both unions and the City and after both unions had invoked interest arbitration procedures. In correspondence between the City and the Policemen's Union after the rule amendment, the union asserted the change concerned "a mandatory subject of bargaining" while the City maintained the change would not apply to existing employees and offered to bargain its "impact."

¶ 9        Also at the hearing, both unions presented testimony from their respective union presidents. Grant Barksdale testified he was the president of the Policemen's Union and was involved in its contract negotiations with the City. He stated that "residency" was "a topic" of current negotiations but that there were no proposals for "anything that had to do with promotional exams."

¶ 10        Barksdale testified he was aware that the City claimed the amendment to Rule 4.3 would not be applied for many years. However, he noted that there were other provisions in the parties' contract that similarly covered future events, including "the sick leave cash-out at the end of someone's career." Barksdale stated the terms of the parties' contract were changed as to that topic and that the change only affected new hires and would not be applied for approximately 20 years.

¶ 11        On cross-examination, Barksdale testified that a police officer had to serve as a patrol officer for seven years before he or she became eligible to apply for a promotion. Further, he agreed that the Policemen's Union had not asked to bargain the "impact" of the amendment and that the City had not refused "impact" bargaining.

¶ 12        Gary Self testified he was the president of the Firefighter's Union from 2015 to 2019 and involved in the most recent CBA negotiations with the City, which began in November 2015. The previous CBA expired in February 2016, and the new CBA was not finally agreed to until February 2019. Self testified that during the parties' contract negotiations, no proposals were made relating to residency preference points for promotional exams.

¶ 13        Self testified that he did not become aware of the rule amendment adopted by the City's Civil Service Commission until after its adoption. He learned of the rule change through conversations with the fire chief. Self further testified that when there was promotional testing for members of his bargaining unit, the top scores would sometimes "come[ ] down to tenths of a point." According to him, adding three points to a candidate's score "[a]bsolutely could decide if someone was promoted."

¶ 14        On cross-examination, Self testified City firefighters had "to have ten years' total department seniority" before they were eligible for promotion. Further, he agreed that the Firefighter's Union had not requested "to impact bargain" the amendment and also that the City had not refused to "impact bargain."

¶ 15        In October 2019, the ALJ issued a recommended decision and order, finding the City violated the Act as alleged by the unions. See 36 PERI ¶ 113 (Administrative Law Judge's Recommended Decision and Order, Oct. 24, 2019) (hereinafter ALJ decision, 36 PERI ¶ 113). Initially, the ALJ found the City's Civil Service Commission was "an arm of the City" and that its actions were "attributable to the City." *Id.* He then determined that the issue of residency preference points relating to the promotional process was a mandatory subject of bargaining and that the City violated sections 10(a)(4) and 10(a)(1) by amending Rule 4.3 to allow for such preference points without first providing both unions notice and an opportunity to bargain. *Id.* The ALJ also found the City violated sections 10(a)(4) and 10(a)(1) of the Act because it

failed to maintain the status quo during interest arbitration procedures as required under section 14(*l*) of the Act. *Id.*

¶ 16 In November 2019, the City filed exceptions to the ALJ's recommended decision and order, denying that it committed unfair labor practices by (1) altering Rule 4.3 without first bargaining with the unions or (2) failing to maintain the status quo during interest arbitration with the unions. Although it agreed that "a change in promotional preferences for residency" was a mandatory subject of bargaining, the City maintained that the ALJ erred in finding the matter had to be bargained *before* the rule change was adopted by the City's Civil Service Commission. The City cited a Board decision that it argued was factually similar to the present case and demonstrated an employer does not commit an unfair labor practice if, after a change is adopted, the union has an opportunity to bargain the change before it goes into effect. Additionally, it maintained that supreme court case authority required only that "negotiation must take place after a rule is adopted [by the City's Civil Service Commission] but before [the rule] is applied to union members."

¶ 17 The City asserted that, in this case, it had not applied the challenged amendment to any member of either the Policemen's Union or the Firefighter's Union. Citing the Illinois Municipal Code, the City argued that state law expressly prohibited "the application of new residency restrictions to current fire and police employees." See 65 ILCS 5/10-1-7(b) (West 2016) ("Residency requirements in effect at the time an individual enters the fire or police service of a municipality *** cannot be made more restrictive for that individual during his or her period of service for that municipality, or be made a condition of promotion, except for the rank or position of Fire or Police Chief."). Accordingly, it maintained it could not apply the preference points rule change to any police officer or firefighter who was employed on the date the amendment was adopted, *i.e.*, September 5, 2018.

¶ 18 The City further argued that the challenged amendment could not be applied for several years to any member of the Policemen's Union and Firefighter's Union who was hired after the amendment's adoption. It noted police officers were required to serve a minimum of 7 years before becoming eligible for promotion, while firefighters were required to serve a minimum of 10 years. Therefore, according to the City, the earliest that residency preference points could be awarded to police officer candidates for promotion was 2025 and the earliest they could be awarded to firefighter candidates for promotion was 2028.

¶ 19 Additionally, the City denied that either the Policemen's Union or the Firefighter's Union was denied an opportunity to bargain. It argued that "[c]ontract negotiations were open for both [unions] after the rule was adopted and before it was applied to [union] members." The City also asserted it had "offered to bargain over the application and impact of the rule" before it was applied to union members and that both unions had refused.

¶ 20 In February 2020, the Board issued its decision and order, rejecting the City's exceptions and adopting the ALJ's findings and recommendations in their entirety. *Policemen's Benevolent & Protective Ass'n*, 36 PERI ¶ 113. Initially, the Board found the City's second exception—its denial that it failed to maintain the status quo during interest arbitration—was procedurally deficient. *Id.* The Board noted its rules required a party to state the grounds for each exception the party submitted, along with citation to authority and the record. *Id.* It found, however, that the City's brief failed to discuss or mention its second exception and provided no citations to authority or the record regarding that issue. *Id.* The Board stated it accepted the

ALJ's recommendation as to that issue, finding his decision well-reasoned and supported by the record. *Id.*

¶ 21　　The Board determined the City's remaining exception—its challenge to the ALJ's finding that it unlawfully changed Rule 4.3 without first bargaining the change with the unions—lacked substantive merit. *Id.* It noted the case authority relied upon by the City had been sufficiently distinguished by the ALJ in his recommended decision and order and stated it agreed with the ALJ's assessment. *Id.*

¶ 22　　This appeal followed.

## II. ANALYSIS

¶ 24　　On appeal, the City argues the Board erred in finding it committed unfair labor practices by adopting a civil service commission rule amendment without offering either the Policemen's or Firefighter's Unions "an opportunity to bargain its application and impact" and while the parties were engaged in interest arbitration. As it did before the Board, the City maintains there was no violation of the Act because the unions had the opportunity to bargain *before* the amendment was *applied* to any union member.

### A. Standards of Review

¶ 26　　Initially, the parties dispute the applicable standard of review. The City argues a *de novo* standard applies because the case involves no disputed facts and the question before this court is a legal one: "[W]hen is a public employer obligated to negotiate the impact of a civil service commission rule, (a) before the rule is adopted for all employees generally, including nonunion employees, or (b) any time before the rule is applied to union members?" Conversely, the Board and both the Policemen's and Firefighter's Unions contend that whether the City committed an unfair labor practice presents a mixed question of law and fact, requiring application of a clearly erroneous standard of review. We agree with the Board and the unions.

¶ 27　　The Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)) governs our review of the Board's final order. See 5 ILCS 315/11(e) (West 2016). Under the Administrative Review Law, judicial review extends "to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3-110 (West 2016). "The applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577, 839 N.E.2d 479, 485 (2005) (hereinafter *AFSCME*).

¶ 28　　"An administrative agency's findings and conclusions on questions of fact are deemed to be *prima facie* true and correct." *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204, 692 N.E.2d 295, 302 (1998) (citing 735 ILCS 5/3-110 (West 1994)). On review, this court "is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence." *Id.* However, an agency's findings on a question of law "are reviewed with less deference" "on a *de novo* basis." *Id.* at 205.

¶ 29　　Finally, when a "case involves an examination of the legal effect of a given set of facts, it involves a mixed question of fact and law" and a clearly erroneous standard of review applies. *Id.*

"Mixed questions of fact and law are questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." (Internal quotation marks omitted.) *AFSCME*, 216 Ill. 2d at 577.

"A decision is 'clearly erroneous' when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Id.* at 577-78.

¶ 30 Here, the material facts are undisputed. In fact, the parties primarily relied upon an agreed set of facts when presenting this case to the ALJ and the Board. Nevertheless, we disagree with the City's assertion that its appeal concerns solely a question of law. We note the applicable rules of law are also not disputed. Instead, the primary conflict between the City and the unions concerns the manner in which to interpret the relevant legal authorities when applying them to the agreed-upon facts in this case. See *City of Belvidere*, 181 Ill. 2d at 205. Under these circumstances, we find the City's appeal presents mixed questions of law and fact and are subject to the clearly erroneous standard of review.

¶ 31                                    B. The City's Obligation to Bargain

¶ 32 Here, both the ALJ and the Board determined the City committed an unfair labor practice by amending Rule 4.3 without first providing the Policemen's and Firefighter's Unions with notice of the change and an opportunity for bargaining. As stated, the City challenges this determination on appeal.

¶ 33 Under the Act, "[a] public employer and the exclusive representative [for its employees] have the authority and the duty to bargain collectively." 5 ILCS 315/7 (West 2016). Although employers are not " 'required to bargain over matters of inherent managerial policy,' " they must " 'bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment.' " *City of Belvidere*, 181 Ill. 2d at 203 (quoting 5 ILCS 315/4 (West 1994)). "The criteria used for determining promotions [is a] mandatory subject[ ] of bargaining." *Mahoney v. City of Chicago*, 293 Ill. App. 3d 69, 72, 687 N.E.2d 132, 135 (1997).

¶ 34 Under section 10(a)(4) of the Act (5 ILCS 315/10(a)(4) (West 2016)), a public employer commits an unfair labor practice by refusing "to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit." Pursuant to section 10(a)(1) of the Act (*id.* § 10(a)(1)), it is also an unfair labor practice for a public employer "to interfere with, restrain or coerce public employees in the exercise of the rights guaranteed in th[e] Act." Ultimately, "[a] public employer *** violates its obligation to bargain in good faith, and therefore sections 10(a)(1) and (4) of the Act, when it makes a unilateral change in a mandatory subject of bargaining without granting notice and an opportunity to bargain with its employees' exclusive bargaining representative." *Amalgamated Transit Union, Local 241 v. Illinois Labor Relations Board, Local Panel*, 2017 IL App (1st) 160999, ¶ 35, 87 N.E.3d 315.

¶ 35 On appeal, the City acknowledges that the amendment to Rule 4.3, which provided for an award of preference points based on residency during the promotional process, concerned a mandatory subject of bargaining. Further, it does not challenge the ALJ and Board's findings that it did not provide notice of or an opportunity for bargaining the decision to change Rule 4.3 before September 5, 2018, when the amendment to the rule was adopted. Instead, the City

contends that no unilateral change resulted from the adoption of the amendment because the amendment (1) did not apply to any current union members and (2) could not be applied to future union members for a period of several years. As a result, the City maintains an opportunity for bargaining was not required before the amendment was adopted in September 2018 but only sometime before it was actually "applied to union members," which according to the City will not occur until 2025 at the earliest. It further argues that it "offered to bargain over the application and impact of the rule before it applies" to union members but both unions refused its offer.

¶ 36                                    1. *Current Union Members*

¶ 37        To support its contention that the amendment to Rule 4.3 did not apply to any union member that was already employed on the date of its adoption, the City cites section 10-1-7(b) of the Municipal Code (65 ILCS 5/10-1-7(b) (West 2016)). That section, entitled "Examination of applicants; disqualifications," states as follows:

> "Residency requirements in effect at the time an individual enters the fire or police service of a municipality (other than a municipality that has more than 1,000,000 inhabitants) cannot be made more restrictive for that individual during his or her period of service for that municipality, or be made a condition of promotion, except for the rank or position of Fire or Police Chief." *Id.*

According to the City, section 10-1-7(b) should be interpreted to mean the September 5, 2018, amendment went "into effect for all City employees *except* the members of the charging unions in this case." (Emphasis in original.) In other words, the amendment's application was limited to only new hires.

¶ 38        The City's argument as to section 10-1-7(b) is conclusory in that it fails to present any reasoned analysis as to how that section impacts upon its amendment to Rule 4.3. We note that when interpreting a statute, the "primary objective is to ascertain and give effect to the intent of the legislature." *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 603-04, 900 N.E.2d 1095, 1101 (2008). "The most reliable indicator of such intent is the language of the statute, which is to be given its plain and ordinary meaning." *Id.* at 604.

¶ 39        Here, as the unions argue, section 10-1-7(b), by its plain and unambiguous terms, prohibits a City from making "[r]esidency requirements" for police and fire personnel more restrictive than they were at the time of hire or making them "a condition of promotion." However, the challenged amendment in this case, sets forth no "requirements" or restrictions based on residency nor does it make residency status a "condition" of promotion. Rather, it has the effect of giving employees who live within the City an advantage when competing for a promotion by providing for an award of preference points on promotional examinations. Individuals living outside the City remain eligible for both employment and promotion. Accordingly, section 10-1-7(b) simply does not restrict the application of the Rule 4.3 amendment as asserted by the City.

¶ 40        Similarly, nothing in the language of the Rule 4.3 amendment limits its application to only new police officer or firefighter hires. The amendment contains no qualifying language and applies on its face to "[q]ualified persons who have passed an examination for promotion." Moreover, even assuming that the amendment's application was limited to new hires, the City fails to address the Board's contention on appeal that "current" employees would still be affected by application of the amendment. As the Board points out, those employees hired prior

to the amendment's adoption could ultimately be disadvantaged by the amendment's application because they could compete for promotions against new hires who are eligible to receive residency preference points. Given the circumstances presented, we find no merit to the City's argument that the Rule 4.3 amendment could not be applied to, or that it had no effect on, current union members.

¶ 41                                    2. *Future Union Members*

¶ 42        Next, in arguing that no unilateral change resulted from the adoption of the amendment to Rule 4.3 because it could not be applied for several years to future union members, *i.e.*, those hired after its adoption in September 2018, the City primarily relies upon one Board decision—*International Brotherhood of Electrical Workers, Local 193*, 35 PERI ¶ 15 (ILRB State Panel 2018) (hereinafter *IBEW*, 35 PERI ¶ 15)—and two supreme court decisions—*City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268*, 122 Ill. 2d 353, 522 N.E.2d 1219 (1988), and *American Federation of State, County & Municipal Employees, Council 31 v. County of Cook*, 145 Ill. 2d 475, 584 N.E.2d 116 (1991).

¶ 43        In *IBEW*, six labor organizations filed unfair labor practice charges against the City, alleging an ordinance, which concerned the timing of vacation payouts, "constituted an unlawful change to a mandatory subject of bargaining." *IBEW*, 35 PERI ¶ 15. The ordinance was passed and signed into law in July 2015 but did not take effect until June 1, 2016. *Id.* The ALJ found the City committed unfair labor practices in two of the cases because it failed to bargain over the changes, which concerned mandatory subjects of bargaining, prior to passing the ordinance. *Id.* Before the Board, the City challenged the ALJ's conclusion that the ordinance "constituted an unlawful unilateral change with respect to" the unions. *Id.*

¶ 44        The Board noted that "[a]n employer violates its duty to bargain in good faith when it makes a unilateral change to a mandatory subject of bargaining without granting notice and an *opportunity to bargain* with its employees' exclusive representative." (Emphasis in original.) *Id.* It found that in the case before it, the ALJ overlooked the fact that the unions "had the *opportunity* to bargain before the June 1, 2016 effective date of the [ordinance]." (Emphasis in original.) *Id.* Specifically, it noted that the unions "had notice and an opportunity to bargain the timing of vacation payouts as both entered into negotiations for a successor [CBA] after the *** [o]rdinance was introduced and ratified the agreement before the June 1, 2016 effective date of the ordinance." *Id.*

¶ 45        Here, we agree with the Board's finding that *IBEW* is distinguishable. As noted by the Board, the change at issue in *IBEW* was not immediately effective and the evidence presented indicated notice to the unions and opportunities for bargaining prior to its effective date. By contrast, the amendment to Rule 4.3 was effective when it was approved by the City's Civil Service Commission in September 2018, and the City does not dispute that it failed to give notice of the amendment and an opportunity for bargaining prior to its effective date.

¶ 46        The City argues that, in distinguishing *IBEW*, the Board ignored "the fact that the rule change here does not apply to [union] members for at least [seven] years." (Emphasis omitted.) However, as found by both the ALJ and the Board, "the unfair labor practice here is the unilateral change to Rule 4.3, and not its application to particular individuals." *Policemen's Benevolent & Protective Ass'n*, 36 PERI ¶ 113 (citing *Wapella Education Ass'n v. Illinois Educational Labor Relations Board*, 177 Ill. App. 3d 153, 168, 531 N.E.2d 1371, 1380 (1988) (stating a "claimed unfair labor practice is the unilateral change in policy not its application to

- 9 -

particular individuals *per se*")). In this instance, the City unilaterally changed Rule 4.3 through the amendment adopted by the City's Civil Service Commission on September 5, 2018. Even if we were to agree that the amendment could not be applied to union members for several years, such circumstances do not negate the fact that a change, without notice and an opportunity for bargaining, occurred when the amendment was adopted and in effect.

¶ 47        As stated, the City also cites two supreme court cases for the proposition that bargaining between a public employer and a labor representative may lawfully occur after a city's civil service commission adopts a rule but before the rule is applied to union members. First, in *City of Decatur*, 122 Ill. 2d at 357, a union alleged the City of Decatur committed an unfair labor practice by refusing "to bargain over a union proposal that would permit employees to submit disciplinary grievances to arbitration." The City, which had adopted a civil service commission under the Municipal Code, argued it had "no duty to bargain over disciplinary matters that fell within the scope of the municipal civil service system." *Id.*

¶ 48        In addressing the issue, the supreme court considered the policy behind the Act, the legislative preference for arbitration to resolve disputes, and the "nature" of the civil service system provided for in the Municipal Code. *Id.* at 364-66. With respect to that latter consideration, it noted the Municipal Code provided for "an optional scheme" and that, generally speaking, "a municipality that has adopted the system may unilaterally alter or amend one of its terms." *Id.* at 365. Ultimately, however, the court rejected the City's argument and stated it did "not believe that the legislature would have intended that the civil service system it made available, as an optional matter, to municipalities in the Municipal Code would eliminate the duty to bargain over the union's proposal." *Id.* at 367.

¶ 49        Second, in *County of Cook*, 145 Ill. 2d at 478, the union filed an unfair labor practice charge with the Board, asserting the county failed to bargain in good faith over the effects of a civil service commission examination requirement for a computer operator position. Relying on the rationale set forth in *City of Decatur*, the supreme court held the county was obligated to bargain as asserted by the union. *Id.* at 482. It held public policy considerations, especially "[w]hen coupled with the optional nature of the civil service system under which the county operate[d]," supported the finding of a duty to bargain. *Id.* at 486. It further stated as follows:

> "In *City of Decatur*, this court observed that '[w]e do not believe that the legislature intended to make the broad duties imposed by the Act hostage to the myriad of State statutes and local ordinances pertaining to matters of public employment.' [Citation.] To the State statutes and local ordinances mentioned in *City of Decatur*, we now add local civil service commission rules as not precluding the broad duty to bargain recognized in [the Act]." *Id.* at 490 (quoting *City of Decatur*, 122 Ill. 2d at 364).

¶ 50        Here, as determined by both the ALJ and the Board, *City of Decatur* and *County of Cook* do not support the City's arguments in this case. Both cases confirmed a public employer's duty to bargain as set forth in the Act even over subjects that may also fall within the scope of a civil service commission. Moreover, neither case addresses the precise issue presented in this case, nor do they stand for the proposition argued by the City on appeal—that it was not required to bargain before adopting the amendment to Rule 4.3. As stated by the ALJ and confirmed by the Board, the City has selectively quoted portions of *City of Decatur* without putting the language it cites in the proper context. See *Policemen's Benevolent & Protective Ass'n*, 36 PERI ¶ 113. Ultimately, none of the case authority cited by the City warrants reversal

- 10 -

of the Board's decision.

¶ 51                          3. *Opportunity to Bargain*

¶ 52    The City additionally argues that neither the Policemen's Union nor the Firefighter's Union were denied an opportunity for bargaining in this case. It notes that after the amendment to Rule 4.3 was adopted, it "offered to bargain over the application and impact of the rule."

¶ 53    The Act provides that public employers are "required to bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment *as well as the impact thereon* upon request by employee representatives." (Emphasis added.) 5 ILCS 315/4 (West 2014). Additionally, "impact" bargaining is not the same as, nor a substitute for, bargaining over a mandatory subject of bargaining in the first instance. See *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 199 Ill. App. 3d 559, 569, 557 N.E.2d 418, 425 (1990) (holding the impact bargaining that followed a layoff decision was not a substitute for mandatory bargaining of the decision itself).

¶ 54    Here, the City's willingness to bargain the impact of its amendment to Rule 4.3 did not excuse it from providing notice of and an opportunity to bargain its initial decision to adopt the amendment. As the ALJ determined and the Board confirmed, the City's arguments otherwise "ignore" its "decisional bargaining" obligation. See *Policemen's Benevolent & Protective Ass'n*, 36 PERI ¶ 113. The Board's determination that the City committed unfair labor practices by amending Rule 4.3 without notice to the unions or an opportunity for bargaining was not clearly erroneous.

¶ 55                    C. Status Quo During Interest Arbitration

¶ 56    On appeal, the City also asserts a challenge to the Board's determination that it impermissibly changed the status quo during interest arbitration with the unions.

¶ 57    "In a typical negotiation where the parties have reached an impasse, the employer can unilaterally implement its final offer, and employees can strike." *Village of North Riverside v. Illinois Labor Relations Board, State Panel*, 2017 IL App (1st) 162251, ¶ 20, 87 N.E.3d 394. However, the Act prohibits certain employees, like police officers and firefighters, from striking, given the essential nature of the services they provide to the community. *Id.* (citing 5 ILCS 315/14(*l*), (m) (West 2014)). As an alternative to the ability to strike, such employees have the ability to submit bargaining disputes to impartial arbitrators. 5 ILCS 315/2 (West 2016) ("To prevent labor strife and to protect the public health and safety of the citizens of Illinois, all collective bargaining disputes involving persons designated by the Board as performing essential services and those persons defined herein as security employees shall be submitted to impartial arbitrators, who shall be authorized to issue awards in order to resolve such disputes.").

¶ 58    More specifically, "the legislature has empowered firefighters [and police officers] through interest arbitration," as set forth in section 14 of the Act (*id.* § 14). *Village of North Riverside*, 2017 IL App (1st) 162251, ¶ 22. Subsection (*l*) of that section provides as follows:

> "During the pendency of proceedings before the arbitration panel, existing wages, hours, and other conditions of employment shall not be changed by action of either party without the consent of the other ***. The proceedings are deemed to be pending

before the arbitration panel upon the initiation of arbitration procedures under this Act." 5 ILCS 315/14(*l*) (West 2016).

¶ 59 In this case, the ALJ determined that the City committed an unfair labor practice by failing to maintain the status quo during interest arbitration as required by section 14(*l*) of the Act. See ALJ decision, 36 PERI ¶ 113. The City filed an exception to that finding with the Board; however, the Board found the issue as presented by the City was procedurally deficient based on the City's failure to present a sufficient argument as to that issue, and it affirmed the ALJ's decision. *Policemen's Benevolent & Protective Ass'n*, 36 PERI ¶ 113. On appeal, the unions and the Board argue the City has forfeited any challenge to the Board's finding that it failed to maintain the status quo. We agree with the unions and the Board.

¶ 60 First, "[t]he failure of a party to raise an argument in its exceptions to the hearing officer's recommended decision and order [forfeits] that argument for purposes of review." *Department of Central Management Services v. Illinois State Labor Relations Board*, 278 Ill. App. 3d 79, 82, 662 N.E.2d 131, 133 (1996). Here, although the City raised an exception to the ALJ's decision that it violated section 14(*l*) of the Act, it did not develop its argument as to that claim, providing no reasoned analysis or citation to legal authority. Such inaction amounts to a failure to raise the argument with the Board and warrants a finding of forfeiture for purposes of appellate review.

¶ 61 Second, the City's arguments on appeal as to this issue are similarly deficient. In its appellant's brief, the City presents a single conclusory sentence, asserting it did not "alter[ ] the status quo for either unions' current members." It neglects to fully develop that argument and does not challenge the Board's earlier rejection of its argument on the basis that it was procedurally deficient. We note the argument section of an appellant's brief must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Additionally, "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." *Id.* Here, the City failed to present a reasoned argument as to this issue, and we agree it has been forfeited.

¶ 62 Additionally, even if we were to set aside the City's forfeiture, we would find no merit to its claim. In its reply brief, the City maintains "it cannot be argued that [it] waived an objection to the ALJ's finding that [it] altered the status quo during negotiations" because its "consistent response to all the findings is that no change has occurred at this time to the union's [*sic*] membership." However, for all the reasons discussed above, a "change" to a mandatory subject of bargaining occurred when the City's Civil Service Commission unilaterally adopted the amendment to Rule 4.3 in September 2018. The amendment altered the status quo between the parties without the unions' consent. Further, the City does not dispute that the amendment was adopted while interest arbitration was pending. Accordingly, the Board did not err in finding the City committed unfair labor practices based upon violations of section 14(*l*) of the Act.

¶ 63                                                 III. CONCLUSION
¶ 64 For the reasons stated, we affirm the Board's decision.

¶ 65 Affirmed.